UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TAMARA ANN HUNT,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 16-cv-00313-JCS

**ORDER GRANTING PLAINTIFF'S MOTION IN PART AND DENYING DEFENDANT'S MOTION**

Re: Dkt. Nos. 15, 18

## I.   INTRODUCTION

Plaintiff Tamara Hunt seeks review of the final decision of Defendant Nancy A. Berryhill, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"). For the reasons stated below, the Court GRANTS in part and DENIES in part Hunt's Motion for Summary Judgment, DENIES the Commissioner's Cross-Motion for Summary Judgment, and REMANDS the case to the Commissioner for further administrative proceedings consistent with this Order.[1]

## II.   BACKGROUND

### A.   Factual Background

Hunt was born on September 29, 1960.  Administrative Record ("AR," dkt. no. 11) at 132. She attended and graduated from high school.  *Id.* at 75.  After completing high school, she started working for AT&T as a collections representative in June 1979.  *See id.* at 156.  Hunt continued working in that capacity until August 17, 2011, when AT&T relocated her position to Southern California.  *See id.* at 35–36, 58–60, 156, 252.  Hunt has not worked since that day.  *See id.*

_____

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

The relevant medical record for this case begins in October 2010, when Hunt saw Dr. Gregory Denari for a checkup. *See id.* at 207. Dr. Denari noted that Hunt suffered from hypertension, but was "[d]oing OK overall" and losing weight. *Id.* Dr. Denari also noted that Hunt was experiencing pre-diabetes and intermittent, but controlled asthma. *Id.* at 208. In May 2011, Hunt was diagnosed with gastro-esophageal reflux disease (referred to as "GERD" and "reflux" in the record and in this Order). *Id.* at 241. She was diagnosed with obesity the following July. *Id.* at 250. In January 2012, Dr. Denari diagnosed Hunt with leg ache. *Id.* at 268.

Dr. Christine Tsou treated Hunt for shortness of breath and conducted a treadmill examination in May 2012. *Id.* at 289. Among Dr. Tsou's conclusions were that Hunt had a hypertensive response to exertion, poor-to-fair exercise tolerance, no chest discomfort, and no significant arrhythmias. *Id.* at 290. Michelle Deconge, the nurse who administered the treadmill examination, noted that the test had been terminated after Hunt had sobbed and asked to stop. *Id.* at 291. Deconge also noted that Hunt had poor exercise tolerance for her age. *Id.*

In July 2012, Dr. Denari diagnosed Hunt with diabetes mellitus (type II) and noted that Hunt was no longer pre-diabetic. *Id.* at 304, 306.

Hunt completed her application for Disability Insurance Benefits under Title II of the Act on April 8, 2013, alleging that she had become disabled on August 17, 2011—the last day that she worked for AT&T—and had remained disabled since that day. *See id.* at 132–35. The application, which was submitted in early May, alleged that Hunt suffered from "muscular atrophy in legs, numbness in lower extremities, loss of balance causing difficulty walking, prediabetes, hypertension, hypothyroidism, GERD, asthma, bulging left eye, [and] vitamin D deficiency." *Id.* at 132 (style altered); *see also id.* at 133–40.

Hunt also started seeing Dr. Heideh Khalilnejad in April 2013. *Id.* at 338. Although Dr. Khalilnejad's treatment notes are difficult to decipher, the record of Hunt's April 10, 2013, appointment indicates that Hunt's "loss of balance" was addressed. *Id.* A record of an appointment two weeks later suggests that Hunt had said that her balance was returning. *Id.* at 337. It is unclear from the record whether Hunt addressed her loss of balance with Dr. Khalilnejad after April 2013. *See id.* at 335–36.

United States District Court
Northern District of California

On July 24, 2013, Hunt completed an Exertion Questionnaire and submitted it to the Administration. *Id.* at 161–64. In the questionnaire, she stated that she lived in an apartment with her family. *Id.* at 161. In response to the questionnaire's request that she describe how her symptoms prevented her from carrying out a normal workday, she stated:

> I am constantly coughing, I cough all night in my sleep, I have a very bad balance problem when walking, I am week and fatigued, I have to hold onto my husband to walk, I rarely leave the house, the alergans [*sic*] in the air choke me constantly, it weakens my whole body.

*Id.* She further stated in the questionnaire as follows. She was not capable of doing much physical activity without needing to sit or lie down. *Id.* Her equilibrium would become unbalanced if she stood too quickly. *Id.* Occasionally, she would fall during her coughing attacks, and had fallen twice recently. *Id.* The distance that she could walk was limited to the distance between her home's parking space and the front door of her apartment, but she could only walk that far with her husband's help. *Id.* She had a problem lifting pots and pans, and she could not carry anything that weighed more than three pounds "without feeling dizzy, fatigued, and off balanced." *Id.* at 162 (punctuation altered). She did not climb stairs, do her own grocery shopping, drive a car, or do yard work. *Id.* Before she became disabled, she "had energy, no balance problem, and no asthma. [She] did all the household chores and drove a car." *Id.* at 163. Since becoming disabled, she had difficulty finishing her housework because she could only work in five-minute intervals, and she could not dust because it would cause her to choke, bring on an asthma attack, and cause her legs to "give out." *Id.* She slept for eight-to-ten hours each day and needed 30-minute naps. *Id.* She used a cane to keep her balance and to stay upright if she coughed. *Id.* She also stated that, "[f]rom lack of being able to exercise, [she had] lost all the muscle tissue in both of [her] legs. They barely [held her] torso in a standing position." *Id.*

Hunt also submitted an Adult Asthma Questionnaire. *See id.* at 166–67. In it, she stated that she experienced asthma attacks in the early mornings, evenings, and late at night, and that she used two inhalers to treat her asthma, one that provided preventative medicine and the other to relieve asthma attacks when they occurred. *Id.* at 166. She also stated that she had never visited an emergency room or otherwise been hospitalized because of her asthma, but she claimed that her

3

asthma was a constant problem that had caused other health issues. *Id.* at 167.

Dr. Clark Gable, an internist, examined Hunt on September 3, 2013. *See id.* at 331−33. The record of Dr. Gable's examination of Hunt begins with the following overview:

> The claimant is a good historian but the case is complicated. I think she does a good job of trying to explain what is wrong. There are follow-up notes from Kaiser. There are multiple clinic visits for her various problems.

*Id.* at 331.

Those problems, Dr. Gable noted, included the following chief complaints: (1) balance problems since 2011; (2) type 2 diabetes, which was first treated in 2011; (3) asthma, which started five years earlier; (4) high blood pressure; (5) hypothyroidism; and (6) reflux. *Id.* at 331. Dr. Gable also noted that Hunt was "fairly markedly obese but stable." *Id.* Dr. Gable further observed:

> She has had some numbness but no tingling in her feet, which seems to go back to the time when she was diagnosed. A major problem, however, has been balance problems. It apparently is not a postural problem. It doesn't come on with rapid head changes or turning quickly. It isn't vertigo and she keeps telling me it's not dizziness. She claims she can't really explain what it is. Sometimes she will be looking straight ahead and if she moves her eyes quickly away, it may cause it. However, she has fallen on several occasions. She states they wondered if it was due to her diabetes, but that is the biggest issue that bothers her. It is the reason she isn't driving apparently.

*Id.*

Recording the results of his examination, Dr. Gable noted that, although Hunt thought she had experienced atrophy in her legs, "she had very muscular calves" and there was no evidence of atrophy in her lower extremities. *Id.* In Dr. Gable's notes, he also recorded that Hunt "seem[ed] overwhelmed by the end of the exam when we discuss[ed] her various problems. She [got] on and off the table with relative ease. She demonstrated no apparent dizziness or imbalance when she was here." *Id.* at 332. Addressing his musculoskeletal examination of Hunt, Dr. Gable stated that "[t]here [was] no atrophy" and "[h]er gait and posture were normal." *Id.* Dr. Gable then provided a functional capacity assessment:

> Based on the history and findings of today's examination, I think the claimant can sit up to 6 hours a day with usual breaks. I think she

1
2    can stand and/or walk up to 6 hours a day with usual breaks. I think
     she can lift, push or pull 25 lbs. frequently and 50 lbs. occasionally.
3    I see no problem with fine finger and hand movements. Nonetheless,
     the concerns about her balance with a history of falling several times
4    over the past month is disturbing with no definitive diagnosis at this
     time. It might be wise for her to carry a cane or whatever if she were
     out walking for any distance.

5    *Id.* at 332–33.

6           On September 19, 2013, Hunt's application was denied on initial consideration. *Id.* at 81.

7    On November 20, 2013, her application was denied on reconsideration. *Id.* at 94. Drs. A.

8    Nasrabadi and S. Reddy reviewed Hunt's medical record for the Administration and both opined

9    that Hunt was not disabled. *See id.* at 71–94. On January 8, 2014, Hunt requested review of her

10   application's denial by an Administrative Law Judge ("ALJ"). *Id.* at 109.

11          Dr. Jerwin Wu, a neurologist, examined Hunt on January 28, 2014. *Id.* at 355–57. In a

12   letter written that day, Dr. Wu listed his impressions of Hunt. *Id.* at 355. The impressions

13   included the following medical conditions: (1) gait ataxia,[2] which Dr. Wu noted might be due to a

14   hereditary form of cerebellar ataxia; (2) sensory neuropathy[3] in her lower extremities of an

15   unknown cause; and (3) "some leg muscles atrophy, probably due to disuse atrophy." *Id.* at 355.

16   Dr. Wu's records from January 28 also indicate that Hunt's 54-year-old sister "began to have

17   unsteady walking at age 51. Her brother might have some problem in walking." *Id.* at 358.

18          On January 31, 2014, Dr. Wu completed an electrodiagnostic report in which he recorded

19   several impressions regarding Hunt's health. *Id.* at 360. Those impressions included that Hunt

20   had "[s]evere sensory neuropathy or neuronopathy in the lower extremities bilaterally," "[m]ild

21   right carpal tunnel syndrome," and "[m]ild right ulnar neuropathy across the elbow." *Id.* Dr. Wu

22   further opined, "I think she also has severe sensory neuropathy or neuronopathy in the upper

23   extremities bilaterally." *Id.*

24

25   [2] Ataxia is defined as "[a]n inability to coordinate muscle activity during voluntary movement;
26   most often results from disorders of the cerebellum or the posterior columns of the spinal cord;
     may involve the limbs, head, or trunk." *Stedman's Medical Dictionary* 81810 (Westlaw 2014).
27   [3] According to *The Merck Manual*, "[h]ereditary sensory neuropathies are rare. Loss of distal pain
     and temperature sensation is more prominent than loss of vibratory and position sense. The main
     complication is foot mutilation due to pain insensitivity, resulting in a high risk of infections and
28   osteomyelitis." THE MERCK MANUAL, 1790 (19th ed. 2011).

United States District Court
Northern District of California

1

On February 18, 2014, Dr. Wu diagnosed Hunt with gait ataxia due to sensory

2 neuronopathy. *Id.* at 347; *see also id.* at 362–63. In his notes from February 18, Dr. Wu observed

3 that Hunt's "[e]lectrodiagnostic motor tests were suspicious of sensory neuropathy," and that her

4 "[h]ead MRI did not show cerebellar atrophy or hydrocephaly." *Id.* at 362. He also noted that

5 Hunt's gait was "moderately unsteady," the results of her pinprick examination were abnormal,

6 and that "vibration sensation is absent in toes bilaterally[,] very reduced in fingers bilaterally." *Id.*

7 Listing his impressions, Dr. Wu further noted that Hunt "most likely has sensory neuronopathy" in

8 addition to diabetes and hypothyroidism. *Id.* Dr. Wu explained that, "since her symptoms have

9 been over for about 5 years[,] sensory neuronopathy due to paraneoplastic syndrome would be

10 unlikely." *Id.* at 363. He also recommended "physical therapy for gait and balance training." *Id.*

11

On March 13, 2014, Dr. Srikanth Muppidi, an Assistant Professor of Neurology at

12 Stanford University, memorialized an examination of Hunt that he conducted that day in a letter to

13 Dr. Wu. *Id.* at 415–18; *see also id.* at 405. In the letter, Dr. Muppidi stated that his impressions of

14 Hunt consisted of predominant sensory neuropathy and sensory ataxia. *Id.* at 415. Dr. Muppidi

15 also observed that the numbness in Hunt's hands had likely begun before the numbness in her feet,

16 she had "severe large fiber sensory loss with preserved pinprick sensation," she had "a mildly

17 wide-based gait," and she had undergone a positive Romberg test.[4] *Id.* Dr. Muppidi opined that

18 the "[o]verall pattern of symptoms and sensory loss [was] suggestive of a sensory neuropathy.

19 Because the balance impairment seems to have preceded numbness in her feet and hands, one

20 should also consider additional posterior column disease." *Id.* Dr. Muppidi noted two incidents in

21 which Hunt had fallen, one six years before his examination of her, the other five years earlier. *Id.*

22 at 416. Dr. Muppidi further noted that Hunt had noticed difficulty with balancing and climbing

23 stairs four years earlier, and that Hunt's balance had worsened gradually since then. *Id.* Dr.

24 Muppidi also stated that Hunt's sister "was diagnosed with possible cerebellar ataxia. She

25 apparently has nystagmus, eye bouncing, severe balance issues and has fallen." *Id.* at 417.

26

27
_____
[4] A Romberg sign occurs "when a patient, standing with feet approximated, becomes unsteady or
28 much more unsteady with eyes closed. Open, it is a sign of proprioception loss." *Stedman's Medical Dictionary* 820310 (Westlaw 2014); *see also id.* 907800.

United States District Court
Northern District of California

1    On March 25, 2014, Dr. Wu completed a Residual Functional Capacity Questionnaire that

2    was submitted to the Administration.  *See id.* at 366–70.  In it, Dr. Wu stated that he had

3    diagnosed Hunt with gait ataxia due to neuronopathy, his prognosis for Hunt was "guarded," and

4    she had a "very unsteady gait."  *Id.* at 367.  Dr. Wu also stated that his clinical findings that

5    supported his diagnosis were a "[v]ery abnormal nerve conduction study" and observing Hunt's

6    "[v]ery unsteady walking."  *Id.*  Responding to the questionnaire's request that he describe

7    treatment for Hunt's conditions, Dr. Wu stated, "I'm not aware of particular treatment for sensory

8    neuronopathy."  *Id.*  Dr. Wu also opined that Hunt's impairments had lasted or would likely last

9    more than 12 months, that Hunt was not a malingerer, that her symptoms would occasionally

10   interfere with the attention and concentration that is necessary to sustain a typical eight-hour

11   workday, and that Hunt could not tolerate "even 'low stress'" at work because it would "increase[]

12   her unsteadiness."  *Id.* at 368.  Dr. Wu further opined on Hunt's functional limitations as follows:

13   (1) she could not sit longer than 20 minutes; (2) she could not stand longer than 10 minutes; (3)

14   she could sit for less than two hours during an eight-hour workday; (4) she could stand or walk for

15   less than two hours during a workday; (5) she would require an unscheduled break every two

16   hours during a workday; (6) she could lift less than 10 pounds rarely, and never anything heavier;

17   (7) she could never twist, stoop, bend, crouch, or climb ladders or stairs; and (8) she had moderate

18   limitations in doing repetitive reaching, handling, and fingering.  *Id.* at 368–69.

19   Hunt underwent an MRI of her thoracic spine on April 10, 2014.  *See id.* at 378–79.  In the

20   record of that procedure, Dr. Mark Culton, the interpreting physician, noted clinical data had

21   shown that Hunt experienced "numbness below the neck with gait ataxia."  *Id.* at 378.  Dr.

22   Culton's findings included that Hunt's "thoracic cord [was] diffusely small in caliber, . . . this

23   finding could represent a congenital variation in the size and configuration of the cord without any

24   obvious indication of myelomalacia."  *Id.*

25   Hunt underwent another MRI on April 16, 2014, which provided imaging of her cervical

26   spine and was also interpreted by Dr. Culton.  *See id.* at 374–77.  In the clinical data notes, Dr.

27   Culton again observed that Hunt had experienced numbness below her neck and gait ataxia.  *Id.*

28   at 374.  In his findings, Dr. Culton observed that "imaging of the posterior fossa and brainstem . . .

show[ed] evidence of mild cerebral atrophy," her "cervical cord [was] diffusely thin in caliber, . . . [which] could represent normal variation in the size and configuration of the cord without any obvious indication of myelomalacia." *Id.*

On May 1, 2014, Dr. Wu completed a "progress report" in which he noted that Hunt continued "to have unsteady walking," "[h]er hands ha[d] been clumsy, difficult to do buttoning," and she "had [a] tendency to lose the balance, especially in the shower room." *Id.* at 373. Dr. Wu observed that an MRI of Hunt's cervical and thoracic spine "showed thinning of the cord, but no other condition." *Id.* Dr. Wu also recorded that a "vibration sensation [was] absent in right toe [and] very reduced in left toe." *Id.* Dr. Wu further observed that Hunt's abnormal gait was "moderately to very unsteady." *Id.* Results of a pinprick test were also abnormal: "decreased in right leg" and "decreased in left leg below the knee." *Id.* Dr. Wu's impressions included sensory neuronopathy that caused gait ataxia and hand clumsiness, as well as thinning of Hunt's cervical and thoracic spinal cord of an unknown cause. *Id.*

Hunt received medical treatment from Dr. Alexander Doan on June 10 and July 8, 2014. *Id.* at 384–89. In records for those treatments, Dr. Doan noted several problems, among them hypertension,[5] which he found to be "[n]ot well controlled due to weight gain. Recommend aerobic exercise with water aerobic of eliptical." *Id.* at 384, 387. Also noted to be among those problems were hereditary sensory neuropathy and primary cerebellar degeneration. *Id.* Dr. Doan observed that his June 10 neurological examination of Hunt showed a "normal gait and stance," and his July 8 examination showed that Hunt had "no tremor; balance [was] not impaired." *Id.* at 385, 388. In a section of his June 10 treatment record entitled *Assessment and Plan*, Dr. Doan noted the following in regard to Hunt's primary cerebellar degeneration: "follow by Dr. Jerwin Wu and Stanford neurology." *Id.* at 385–86. There was no notation in Dr. Doan's *Assessment and Plan* section for cerebellar degeneration in the record of the July 8 treatment. *See id.* at 389.

On August 27, 2014, Hunt underwent EMG and nerve conduction studies at Dr. Muppidi's

---

[5] Dr. Doan used the abbreviation HTN in the treatment record. *See* AR at 384, 387. HTN is a common medical abbreviation for hypertension. *See Stedman's Medical Dictionary* 416660 (Westlaw 2014).

United States District Court
Northern District of California

direction "to better characterize her sensory neuropathy." *See id.* at 473–76.  Dr. Muppidi

concluded that "[t]hese electrodiagnostic studies demonstrate sensory neuropathy/neuronopathy,

without evidence of motor nerve involvement." *Id.* at 475.

Dr. Muppidi also wrote a letter to the Administration on September 19, 2014. *Id.* at 404–

05.  In the letter, he stated:

> Tamara Hunt is followed by the neuromuscular team here at
> Stanford for evaluation of progressive gait imbalance (Ataxia)
> and sensory neuropathy. Her condition makes it very difficult to
> ambulate safely and perform routine work related activities safely
> and I believe she is significantly disabled and like [*sic*] will remain
> so in near future.

*Id.* at 405.

On October 30, 2014, the ALJ held a hearing to review Hunt's application for disability

benefits.  *See id.* at 32.

## B.    The Hearing

### 1.    Hunt's Initial Testimony

At the start of the hearing, Hunt testified that she was 54 years old, 5′7″ tall, and weighed

227 pounds.  AR at 34.  A year earlier, she had weighed 260 pounds.  *Id.*  Hunt had been married

for 34 years and her husband was retired.  *Id.* at 34–35.  She graduated from high school, but had

no other vocational training.  *Id.* at 35.

Hunt had last worked in August 2011.  *Id.* at 35–36.  At that time, she was a collections

representative for AT&T, a company for which she had worked for 27 years.  *Id.* at 35.  Hunt

retired from AT&T when her office was moved to Southern California, and she could not move

there for her job.[6]  *Id.* at 35–36.

### 2.    Dr. Nelp's Testimony

Dr. Wil Nelp, Professor of Medicine and Radiology at the University of Washington, and

board certified in internal medicine and nuclear medicine, testified as a medical expert after

---

[6] Later in the hearing, Hunt testified that she was uncertain whether her decision to take a
"buyout" from AT&T meant that she had retired.  AR at 58–59.  She also explained that the
money from that buyout was kept in an IRA account from which she could request funds annually.
*Id.*

United States District Court
Northern District of California

1   reviewing Hunt's medical records.  AR at 33, 38–40, *see also id.* at 406.

2       Dr. Nelp's testimony began with a summary of Hunt's health in which he stated that Hunt

3   suffered from "several persistent issues," including obesity, minor diabetes for which she took oral

4   medication, low thyroid function that was treatable by medication, modest hypertension with no

5   recorded complication, normal-to-slightly-high blood pressure, intermittent shortness of breath or

6   asthma that was treated with an inhaler, and minor esophageal discomfort that was treated by oral

7   medication.  *Id.* at 40–41.  Dr. Nelp also noted that examinations had indicated that Hunt's lungs

8   were clear and EKGs yielded normal results.  *Id.* at 41.

9       Transitioning to Hunt's major medical issues, Dr. Nelp stated that Hunt suffered from "a

10  feeling of unsteadiness when walking."  *Id.*  He described Hunt's sensory neuropathy and other

11  conditions from which she suffered as follows:

12          This sense of imbalance is due to a condition called sensory
            neuropathy. This is not a diabetic neuropathy, but probably a
13          hereditary neuropathy. [Hunt's] sister apparently has some similar
            issues. This problem has been fully evaluated at the Stanford
14          Clinic. . . . Major issues[: a] loss of full sensation in the hands and
            feet, such that [Hunt] shows unsteady while walking or climbing or
15          changing positions. This is referred to as a sense of imbalance. All
            objective examinations such as MRI of the spinal cord show no cord
16          compression, and a relatively small spinal cord, but no major disc or
            bony changes. . . . Feels wobbly when walking; worse when it's
17          dark and can't see the surroundings. MRI of the brain showed mild
            changes in the cerebellum, posterior area of the brain; no pain
18          associated with this. The full neurological exam . . . notes good
            muscle strength . . . normal gait; slightly broad-based. [She] cannot
19          stand with legs closed together without wobbling. . . . Coordination
            was intact. . . . When you tweak or touch the skin lightly, she had
20          some sensory loss. And this is referred to as sensory neuropathy.

21  *Id.* at 41–42.  Dr. Nelp also addressed the physical examinations performed and evaluations

22  completed by agency examiners and experts, calling them "[g]ood" and "[e]xcellent" reviews of

23  Hunt's health issues.  *Id.* at 43.

24      Opining on the Commissioner's Medical Listings, Dr. Nelp stated that Hunt would not

25  meet or equal Listing 2.07 for special senses, explaining that Hunt "has an unusual loss of sensory

26  function, with good preservation of other neurological capability."  *Id.* at 43–44.  Dr. Nelp further

27  opined that Hunt's "general health [was] otherwise very good."  *Id.* at 44.

28      Dr. Nelp then addressed Hunt's residual functional capacity ("RFC"), opining that she

United States District Court
Northern District of California

could work in an environment that did not require climbing or complex walking; she could lift at least 20 pounds occasionally and 10 pounds frequently; she could stand and walk on smooth surfaces for up to six hours; she could sit at least six hours; and she could use a cane if she desired more stability when she walked. *Id.* Hunt's postural limitations included occasional use of ramps or stairs, no use of ladders or ropes, and no balancing. *Id.* Hunt should also avoid all hazards and heights, moderate exposure to fumes and dust, and concentrated exposure to other environmental issues. *Id.*

Dr. Nelp testified that his assessment of Hunt's impairments applied from the time of her alleged disability onset date to the date of the hearing. *Id.* at 45. Dr. Nelp further testified that Hunt did not meet or equal any of the Medical Listings, including Listing 2.07. *Id.*

On cross-examination, Dr. Nelp testified that pinprick sensation tests of Hunt's legs would not have an effect on her ability to manipulate objects. *Id.* at 46. Dr. Nelp further explained, "That is a loss of very fine sensation for needle prick, and that's part of the sensory neuropathy. There's been no description of loss, inability to move fingers, or touch, or pick up light objects in the medical records. . . .  Sensory neuropathy is a very unusual condition." *Id.*

Dr. Nelp also testified that Hunt "should be able to walk at least a block or more" with a walker. *Id.* at 47–48. Upon further questioning about Hunt's use of a walker, Dr. Nelp explained, "It's not a matter of strength or energy; it's a matter of her sensation of instability. And balancing with a cane or a walker would be helpful." *Id.* at 48. Dr. Nelp further opined that it was not medically necessary for Hunt to use a walker. *Id.*

### 3.   Hunt's Examination

After Dr. Nelp's testimony concluded, Hunt was questioned by her representative. *See* AR at 48–49. In response to being asked what prevented her from working, Hunt testified, "Loss of balance, coordination, the wobbly, the turning from motion to motion from one direction to another." *Id.* at 49. She explained that she could not shower alone, could not stand in darkness without feeling like she would fall, and could not ascend stairs. *Id.* Hunt further explained that she moved around her home by using the walls for support. *Id.* at 49–50. She had been using a walker prescribed by Dr. Wu for more than a month. *Id.* at 50. She did not feel sufficiently secure

11

when she had attempted to use a cane in the past. *Id.*

Hunt testified that she did not go outside because it required walking, and she always felt like she would fall. *Id.* at 51. She could walk from her front door to her mailbox and back while holding onto her husband's hand, but could no longer go outside and exercise as she had in the past. *Id.* Hunt explained, "It just—my everything's thrown off. Like right now, you know, I feel this all the time. It's constant." *Id.* Hunt also testified that her hands had stiffened and were "not coordinating." *Id.* She could no longer tie her shoes or put on lipstick or earrings. *Id.* at 52. Hunt concluded:

> [T]his condition has—I don't mean to get emotional, but it's taken over my life. And it's, like, part of me. It's just part of my whole self. It's gotten worse and worse . . . . Little things I'm noticing. Just, like, you know, I'm sitting more at my house. I'm sitting there. Because if I get up, you know, I'll walk to the kitchen. And I used to cook a lot . . . . But when I go from the sink to the stove, that movement, that's what sets me off. And I feel like I'm in a tunnel. It's just a terrible thing. It's very hard to live with.

*Id.*

The ALJ then asked Hunt to address her ability to sit for six hours during an eight-hour period. *Id.* at 53. Hunt testified that she did not get up often and spent approximately three hours lying down. *Id.* at 53–54. Hunt explained that she could sit only a few hours before needing to stand, and estimated that she could sit for five hours in an eight-hour period. *Id.* at 54. Hunt also testified that she would lie down every afternoon. *Id.*

Hunt's representative resumed questioning her, asking her if lying down during the day brought her relief. *Id.* Hunt responded that she would feel "relief from the dizziness, from the imbalance part of it." *Id.* Hunt testified that she did little outside the home, never going to religious services or social groups, and only going to the grocery store once per week when her husband drove her. *Id.* at 54–55. Hunt further explained that, while at the grocery store, she used a shopping cart as her walker. *Id.*

Hunt also testified that, in terms of housework she performed, she was able to vacuum her small apartment every three or four days, but vacuuming had grown more difficult because "it ha[d] become very heavy on [her] hands." *Id.* at 55. Hunt explained that she struggled to do the

United States District Court
Northern District of California

dishes, lacking the ability to lift pots or pans and needing her husband's help. *Id.* She stated, "My hands are . . . stiff, and the strength isn't there." *Id.* Hunt further explained that she was able to stand and cook for about five minutes at a time before "go[ing] in the living room and sit[ting] down, not due to fatigue or tiredness; just due to going from the stove to the sink. The movement of that." *Id.*

Asked if she was able to drive a car, Hunt responded that she could not, and had not driven for at least five years. *Id.* at 56. Hunt testified that her husband always drove her, and had driven her to-and-from work during her last year as an AT&T employee. *Id.*

Hunt then testified that she had been experiencing physical difficulties toward the end of her employment at AT&T. *Id.* Describing how her condition had worsened before her employment ended, she stated:

> A year and a half [before August 2011] is when it really started to come on. And I was at work. And I noticed it because I used to walk the building at lunch. And then I noticed that I was feeling the imbalance, and I noticed I was hanging onto the wall getting back to my desk. And those kind of issues were coming up. And then it just has exceeded. I mean I think now it's at the worst point it's been.

*Id.* at 56–57.

Asked to compare her symptoms at the time she stopped working to the time of the hearing, Hunt responded that she struggled more with imbalance and "wobbling" when she stopped working, but the symptoms and stiffness that she experienced in her hands had started nine months before the hearing. *Id.* at 57.

## C.    Legal Background

Disability Insurance Benefits are available under the Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). The Commissioner has established a five-part, sequential evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four,

but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If she is, the ALJ must find that she is not disabled. *Id.* If she is not engaged in substantial gainful activity, the ALJ continues the analysis. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the regulations' 12-month-duration requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, she is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ considers the claimant's RFC in light of her impairments and whether she can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)). If she can perform past relevant work, she is not disabled. *Id.* If she cannot perform past relevant work, the ALJ proceeds to the final step. *See id.*

At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1520(a)(4)(v). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not

United States District Court
Northern District of California

14

a significant number of jobs available in the national economy that she can perform.  *Id.*

**D.    The ALJ's Decision**

In her decision, issued February 19, 2015, the ALJ considered two questions.  *See* AR at 14–25.  First, she considered whether Hunt was disabled under the Act.  *Id.*  Second, she considered whether the insured status requirements of the Act were met.  *Id.*  After describing the Commissioner's five-step evaluation process, the ALJ first determined that Hunt met the insured status requirements of the Act through December 31, 2016.  *See id.* at 15–16.  The ALJ then applied the five-step analysis and determined that Hunt was not disabled.

**1.    Step One**

At step one, the ALJ found that Hunt had not engaged in substantial gainful activity since her alleged onset date of August 17, 2011.  *Id.* at 16.

**2.    Step Two**

Next, the ALJ found at step two that Hunt suffered from three severe impairments: peripheral sensory neuropathy, asthma, and obesity.  *Id.* (citing 20 C.F.R. § 404.1520(c)).  The ALJ also described several impairments as nonsevere—hypertension, gastro-esophageal reflux disease, hypothyroidism, and diabetes—finding that "[t]hese conditions are all well-managed, and do not significantly limit [Hunt's] mental or physical ability to do basic work activities."  *Id.* at 16–17.

**3.    Step Three**

At step three, the ALJ found that Hunt did not have an impairment or combination of impairments that met or equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 17 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  The ALJ reasoned, "No treating or examining physician has suggested the presence of any impairment or combination of impairments of listing level severity."  *Id.*  Citing Listings 1.02(A) and 2.07, the ALJ further explained that she had considered listings related to "special senses and musculoskeletal impairments," but found that Hunt's impairments fell short of the criteria provided in the cited listings.  *Id.*

Addressing those Listings, the ALJ reasoned that, although Hunt had alleged difficulty

United States District Court
Northern District of California

ambulating due to problems balancing and her neurologist had recommended that she use a cane to prevent her from falling, the record as a whole showed that Hunt did not fall frequently and Hunt's impairment did not equal Listing 1.02(A). *Id.* In determining that Hunt's impairments fell short of equaling Listing 2.07, the ALJ cited Dr. Nelp's testimony that Hunt's neuropathy did not meet or equal the listing "for disturbance of labyrinthine-vestibular function." *Id.*

### 4. Step Four

The ALJ found at step four that Hunt had the RFC to perform light work with the following limitations:

> [Hunt] can occasionally lift/carry twenty pounds and frequently lift/carry ten pounds. [She] can stand/walk for six hours in an eight-hour workday on smooth surfaces. [She] can sit for six hours in an eight-hour workday. [She] can never work in an environment where she is expected to climb stairs or balance. [She] can occasionally climb ramps. Due to her obesity, [she] is limited to occasional overhead reaching bilaterally. [She] must avoid hazards, including heights and dusts.

*Id.* at 17–18. In reaching this finding, the ALJ considered the severity of Hunt's symptoms, Hunt's credibility, and the medical opinion evidence. *See id.* at 18–23.

#### a. Symptom Severity

Addressing Hunt's sensory peripheral neuropathy, the ALJ observed that Hunt had been diagnosed with hereditary cerebellar ataxia, severe sensory neuropathy in her lower extremities, delayed reflexes, mild right carpal tunnel syndrome, and leg muscle atrophy that was likely the result of disuse. *Id.* at 19. The ALJ noted that Hunt had complained of problems balancing, numbness in her hands and feet, difficulty climbing stairs, and, starting in 2011, needing to hold onto walls to keep herself from falling. *Id.* The ALJ explained that Hunt's sensory neuropathy had been confirmed by electrodiagnostic studies, and that her treatment providers had recommended further imaging. *Id.* The ALJ also explained that, although treatment providers had recommended that Hunt use a cane and she had been issued a handicapped parking placard, the record did not contain a recommendation that Hunt cease working because of her impairments. *Id.*

The ALJ next observed that Hunt's asthma was well-controlled by two inhalers. *Id.* Addressing the allegation of constant coughing, the ALJ found that treatment records indicated

1     that Hunt could work despite her reports of experiencing debilitating weakness from it.  *Id.*  The

2     ALJ noted an instance in which Hunt took three days' leave due to coughing, but her subsequent

3     return to work without restriction "suggest[ed] her asthma symptoms do not prevent her from

4     performing her sedentary job."  *Id.* (citation omitted).  The ALJ also noted an exercise test in

5     which Hunt's shortness of breath was evaluated, finding that "[t]esting revealed no pain on

6     presentation, no chest discomfort, and no ischemic EKG changes, clearly indicating[ that] her

7     reported symptoms from this condition were not as severe as alleged."  *Id.* at 19–20 (citation

8     omitted).  The ALJ further noted that Hunt had been instructed to use one of her inhalers less

9     frequently, which suggested that her asthma symptoms had improved.  *Id.* at 20.

10          Addressing Hunt's obesity, the ALJ found that Hunt was 5′7″ tall, weighed 247 pounds,

11    and had a body mass index of 39.  *Id.*  The ALJ explained that, although Hunt had not alleged an

12    "impairment due to her obesity, the effects of [her] obesity have been considered when

13    determining a residual functional capacity for [her]."  *Id.*

14          The ALJ also made more general findings that Hunt's physical examinations were

15    inconsistent with disabling impairments.  *Id.*  The ALJ observed that, during physical

16    examinations of Hunt, she "was able to get on and off the table with relative ease"; "[s]he

17    exhibited no apparent dizziness, imbalance, or atrophy"; and "[s]he had normal range of motion of

18    her neck, shoulder, elbows, and wrists, normal grip strength, and preserved reflexes."  *Id.*

19    (citations omitted).  The ALJ noted that a January 28, 2014, neurological examination "revealed

20    normal muscle tone, muscle strength, muscle bulk, and coordination."  *Id.* (citation omitted).  The

21    ALJ also observed that other neurological examinations had revealed no muscle weakness or

22    tremor, that Hunt's balance was not impaired, and that she had a normal gait and stance.  *Id.*

23          Likewise, the ALJ made general findings that "objective evidence is inconsistent with a

24    disabling impairment."  *Id.*  According to the ALJ, that evidence included MRIs of Hunt's head

25    and spine, electrodiagnostic testing, a needle EMGs, motor nerve conduction studies.  *Id.*

26               b.  Hunt's Credibility

27          The ALJ also reached her RFC finding after determining that Hunt had made inconsistent

28    statements and other statements that conflicted with the record, both of which undermined her

United States District Court
Northern District of California

United States District Court
Northern District of California

credibility. *Id.* at 20–21. Addressing one series of apparently inconsistent statements, the ALJ noted that Hunt had told Dr. Gable and testified at the hearing that her instability was caused by balance issues, but Hunt had written in the Exertional Activities Questionnaire that "coughing attacks, cause her to sometimes fall, not balance issues." *Id.* (citation omitted). Addressing another series of such statements, the ALJ observed that Hunt stated in the Exertional Activities Questionnaire that she did "not go grocery shopping or clean her home . . . . Yet, at the hearing, she testified that she grocery shops with her husband and vacuums once per week." *Id.* at 21. The ALJ noted that, according to a March 2014 statement, Hunt had only fallen twice, once in 2008 and another time in 2009; however, two months earlier, Hunt stated that she had fallen in July 2013. *Id.* The ALJ also observed that Hunt's application alleged an inability to work due to balance issues, but she had denied difficulty with balance and numbness during physical examinations. *Id.*

Turning to statements that conflicted with the record, the ALJ observed that Hunt reported in the Exertional Activities Questionnaire that she was unable to exercise and, as a result, she lost muscle tissue in her legs, which could barely support her torso when standing; however, the ALJ found that "[t]he objective evidence does not support this report" and a physical examination of Hunt's "extremities performed on September 3, 2013 revealed no atrophy." *Id.* In her Asthma Questionnaire, Hunt claimed to "hav[e] asthma attacks every morning and late at night," but treatment records of her asthma described the ailment "as controlled with use of her inhaler in the morning and use of her albuterol inhaler every other day." *Id.* The ALJ also "acknowledge[d] that the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead; nevertheless, the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable." *Id.*

The ALJ also noted particular circumstances that raised questions as to Hunt's credibility and the severity of her symptoms. *Id.* First, the ALJ observed that, in August 2011, Hunt stopped working because her employer relocated her job and she immediately started collecting unemployment, which suggested that Hunt was able to work. *Id.* (citation omitted). Second, the ALJ found that Hunt had been noncompliant with her treatment, refusing to schedule an

18

appointment for a diabetic retinal screen or engage in balance training for gait ataxia. *Id.* Third, the ALJ found that treatment recommended by Dr. Doan—aerobic exercise in water or elliptical training—suggested that Dr. Doan did not consider Hunt's balance-disturbance symptoms to be as disabling as she had alleged. *Id.*

c.   Medical Opinion Evidence

The ALJ further found that medical opinion evidence supported her RFC determination. The ALJ's consideration of medical opinion evidence begins with that of Dr. Gable, an opinion that she accorded great weight. AR at 21–22. The ALJ found that, during Dr. Gable's September 3, 2013, Hunt "complained of balance problems ongoing since 2011, asthma, diabetes, high blood pressure, GERD, and hypothyroidism." *Id.* at 21. Hunt reported to Dr. Gable that she had numbness in her feet, but no tingling. *Id.* at 21–22. Hunt also reported that she had stopped driving because of her balance problems and she had stopped working in August 2011 due to her job's relocation. *Id.* at 22. Hunt denied postural problems, vertigo, and dizziness. *Id.*

The ALJ noted that, during the examination, Hunt "was able to get on and off the table with relative ease" and "[s]he demonstrated no apparent dizziness or imbalance." *Id.* The ALJ also noted the results of the examination, which included the following: (1) no musculoskeletal atrophy; (2) normal grip strength; (3) normal range of motion for her neck, shoulders, elbows, and wrists; (4) diabetes; (5) mild numbness in her feet, but no other symptoms of diabetic neuropathy; (6) asthma that was under good control by medication; (7) hypertension that required better control; (8) hypothyroidism that required increased medication; (9) and reflux, which was well controlled by medication. *Id.* at 22.

The ALJ also described Dr. Gable's RFC opinion as follows: Hunt "could sit up to six hours in an eight-hour workday with usual breaks, stand/walk up to six hours in an eight-hour workday with usual breaks, lift, push, or pull twenty-five pounds frequently and fifty pounds occasionally" and that, based on Hunt's self-reported history, "it would be wise for her to carry a cane." *Id.* The ALJ further explained:

> Dr. Gable's opinion is inconsistent with the treatment record, which clearly documents a diagnosis of sensory peripheral neuropathy. Dr. Gable also fails to consider [Hunt's] obesity in his functional

19

United States District Court
Northern District of California

1

2

3

4

5

> assessment. Accordingly, the undersigned finds that these conditions and the objective findings support a more restrictive RFC. Specifically, the objective evidence revealed Sensory [*sic*] neuropathy was confirmed by electrodiagnostic studies. Physical examination was consistent with some bilateral lower extremity numbness. Further, the record shows the claimant is 5′7″ and weighs 247 pounds, thus is considered obese with a BMI of 39. These findings support restricting the claimant to a reduced range of light work.

6 *Id.* (citation omitted).

7      Turning to the opinions of Hunt's treating physicians, the ALJ reviewed the Medical

8 Source Statement that Dr. Wu had completed, which is detailed above. *Id.* The ALJ then

9 accorded Dr. Wu's opinion "little weight," reasoning:

10

11

12

13

> This opinion is inconsistent with [Hunt's] reports to other physicians and physical and neurologic examinations performed by other physicians. A physical examination of the claimant's extremities performed on September 3, 2013 revealed no atrophy. She denied difficulty with balance and numbness. Neurological examination revealed no muscle weakness, no tremor, balance was not impaired and a normal gait and stance.

14 *Id.* (citations omitted).

15      The ALJ next addressed the opinion that Dr. Muppidi had rendered September 5, 2015. *Id.*

16 at 22–23. The ALJ first observed that Dr. Muppidi had opined that Hunt "was significantly

17 disabled secondary to difficulty ambulating safely and performing routine work related activities

18 safely." *Id.* The ALJ then stated, "[T]he undersigned notes that the issue whether an individual is

19 able to work is an issue reserved for the Commissioner, and treating source opinions on issues that

20 are reserved to the Commissioner are never entitled to controlling weight or special significance."

21 *Id.* at 23 (citing SSR 96-5P). The ALJ further stated that she "ha[d] considered Dr. Muppidi's

22 opinion, and g[ave] it little weight, as it d[id] not provide any specific work limitations." *Id.*

23      Transitioning to nonexamining doctors who had reviewed Hunt's medical records for the

24 Administration, the ALJ stated that she gave "partial weight" to the opinion rendered by Dr. Nelp.

25 *Id.* The ALJ explained that Dr. Nelp had "testified that [Hunt's] impairment did not meet or equal

26 any Listing." *Id.* Dr. Nelp had further opined that Hunt "could work in an environment with no

27 stairs; lift/carry ten pounds frequently and twenty pounds occasionally; stand/walk for six hours on

28 smooth surfaces, using a cane; sit for six hours; occasionally climb ramps; and never climb ropes,

balance, [or] reach overhead." *Id.* According to Dr. Nelp, Hunt also needed to avoid hazards, heights, and dust. *Id.* The ALJ reasoned, "While [Hunt's] RFC is generally consistent with Dr. Nelp's opinion, . . . there is no need for cane. The record shows [Hunt] was prescribed a cane because she reported falling frequently due to her balance problems. However, the record shows [her] history of falls predated her [alleged disability onset date]." *Id.* The ALJ explained that Dr. Nelp's testimony and evidence from the record supported a finding that there were additional restrictions to Hunt's RFC: "Specifically, the undersigned finds [Hunt's] obesity supports restricting her to performing light exertional work, never climbing stairs or balancing, occasional climbing of ramps, and occasional reaching overhead with her bilateral upper extremities." *Id.*

The ALJ also granted partial weight to the opinions of the state agency medical consultants, who had opined:

> [Hunt] could perform medium work with frequent climbing of ramps and stairs, stooping, balancing, kneeling, crouching, and crawling and occasional climbing of ladders, ropes, and scaffolds. . . . [She] should avoid exposure to fumes, dusts, odors, gases, poor ventilation, and hazards. . . . [She] may need a cane for long distance walking if she feels dizzy.

*Id.*

### d. Capacity to Perform Past Work

After reviewing the medical opinion testimony, the ALJ found that Hunt had the RFC to perform her past work as a collections clerk. AR at 23.

### 5. Step Five

The ALJ considered step five in the alternative, finding that Hunt had the RFC to perform other jobs in the national economy due to her age, high school education, and work experience. *Id.* AR at 24. The ALJ explained that Hunt had the ability to perform "all or substantially all" of "the full range of light work." *Id.* (citing SSR 83-11; 20 C.F.R. § 404.1569a(d)).

Based on these findings, the ALJ determined that Hunt was not disabled from the alleged disability onset date of August 17, 2011, through the date of the ALJ's decision. *Id.* at 24–25.

1

United States District Court
Northern District of California

### E.   Subsequent Proceedings

On March 5, 2015, Hunt's representative requested review of the ALJ's decision by the Social Security Appeals Council.  AR at 67.  On December 3, 2015, the Appeals Council sent Hunt notice that it had denied the request for review of the ALJ's decision.  *Id.* at 4–9.

On January 20, 2016, Hunt filed this action, seeking the Court's review of the Commissioner's final decision.  *See* Compl., dkt. no. 1.  The parties now move for summary judgment.  *See* Pl.'s Mot. for Summ. J. ("Mot.," dkt. no. 15); Def.'s Cross-Mot. for Summ. J. ("Cross-Mot.," dkt. no. 18).

### F.   The Motions

#### 1.   Hunt's Motion for Summary Judgment

Hunt filed a Motion for Summary Judgment and claims that the ALJ committed legal error in rendering her decision.  Mot. at 1.  Hunt requests that the Court reverse the ALJ and remand her case for the calculation and award of benefits or, alternatively, for a new hearing.  *Id.*

According to Hunt, the ALJ erred by granting insufficient weight to the opinions of Hunt's treating neurologists, Drs. Muppidi and Wu.  *Id.* at 9.  Hunt explains that the ALJ's reasons for rejecting their opinions are required to be specific and legitimate because the ALJ found that Dr. Gable's opinion contradicted those of Drs. Muppidi and Wu.  *Id.* at 10.  Acknowledging the leniency of this standard, Hunt argues that the ALJ's reasons nevertheless fall short of being specific and legitimate.  *Id.*

Hunt argues that the ALJ improperly rejected Dr. Muppidi's opinion for two reasons.  First, Hunt asserts that the ALJ improperly objected to the entirety of Dr. Muppidi's opinion on the sole basis that the legal determination of a claimant's disability is reserved for the Commissioner.  *Id.* at 11.  Hunt further asserts that, although a doctor's opinion on the ultimate issue of disability is "not necessarily binding on the Commissioner," an ALJ must still consider that doctor's opinion when analyzing whether a claimant is disabled.  *Id.* (citing *Rodriguez v. Bowen*, 876 F.2d 759, 762 n.7 (9th Cir. 1989)).  Second, Hunt asserts that the ALJ's conclusory rationale failed to recognize the entirety of Dr. Muppidi's opinion—namely how Hunt's conditions made it difficult for her to ambulate or perform routine work safely.  *Id.*  Hunt further

22

1    asserts that, although an ALJ may reject the portion of a doctor's opinion on the ultimate issue of

2    disability because it is reserved for the Commissioner, an ALJ must still consider any remaining

3    parts of the doctor's opinion that reflect more specific functional limitations.  *Id.* at 11–12.

4         Hunt also argues that the ALJ's rejection of Dr. Wu's opinion was improper for two

5    reasons.  *Id.* at 12–13.  First, Hunt asserts that the rejection of Dr. Wu's opinion was improper to

6    the extent that it was based on the opinion's inconsistency with other findings and reports, notably

7    Dr. Gable's examination and opinion.  *Id.*  Hunt further asserts that Dr. Wu's opinion was not only

8    a more specific and broad assessment of her RFC, but Dr. Wu constituted a medical source with

9    greater expertise.  *Id.*  Hunt also asserts that the inconsistencies upon which the ALJ relied—

10   namely, the disparate findings the respective doctors made regarding muscular atrophy in Hunt's

11   legs—are insufficient as a result of Dr. Wu's explanation that his opinion was based on Hunt's

12   "very abnormal nerve conduction study" and "very unsteady walking."  *Id.* at 13 (citing AR at

13   367).  Second, Hunt asserts that the other examinations on which the ALJ relies to reject Dr. Wu's

14   opinion are irrelevant to sensory neuropathy and gait ataxia, which, according to Hunt, form the

15   basis of her disability.  *Id.*  Hunt also criticizes the ALJ's reliance on records from Dr. Doan's

16   treatment of Hunt for diabetes as a basis for rejecting Dr. Wu's neurological assessment.  *Id.*

17        Contending that the ALJ erred by finding that Hunt's own claims regarding her physical

18   limitations lacked credibility, Hunt argues that none of the ALJ's several rationales met the

19   applicable clear-and-convincing standard for rejecting a claimant's testimony.  *Id.* at 14.  Hunt

20   criticizes the ALJ's reliance on certain findings from physical examinations, asserting that the ALJ

21   noted benign happenstances, not actual medical evidence undermining Hunt's claims, and ignored

22   critical findings that corroborated the claim that she was disabled.  *Id.* at 14–15 (citing, *inter alia*,

23   *Tackett*, 180 F.3d at 1102).  Hunt also criticizes the ALJ's rationale that objective evidence in the

24   record—including the results of an MRI that did not show cerebellar atrophy on Hunt's brain and

25   that electrodiagnostic testing did not confirm sensory neuropathy—was inconsistent with finding

26   that her sensory neuropathy was a disabling impairment.  *Id.* at 15–16.  Hunt further asserts that

27   the ALJ misinterprets the cited objective evidence.  *Id.* at 16.  Hunt finally criticizes the ALJ's

28   findings that she made inconsistent and conflicting statements, asserting that those findings are the

United States District Court
Northern District of California

23

1    result of mischaracterizing, misquoting, and decontextualizing Hunt's statements as well as the

2    ALJ's faulty reasoning.  *See id.* at 16–20.

3              **2.  The Commissioner's Cross-Motion**

4              The Commissioner has filed a cross-motion for summary judgment and claims that the

5    Court should affirm the ALJ's decision because it resolved conflicts in the record properly, the

6    ALJ explained her findings, and she supported those findings by citing substantial evidence in the

7    record.  Cross-Mot. at 5.  The Commissioner then responds to some of the arguments that Hunt

8    asserted in her Motion.

9              First, the Commissioner contends that the ALJ evaluated the medical opinions and

10   evidence in the record properly.  *Id.*  Addressing the ALJ's rejection of Dr. Muppidi's opinion, the

11   Commissioner argues that two proper bases were offered: (1) Dr. Muppidi had opined on the

12   ultimate issue of disability, which is expressly reserved for the Commissioner; and (2) Dr.

13   Muppidi did not articulate specific limitations or restrictions for the ALJ to consider.  *Id.* at 5–6

14   (citing 20 C.F.R. §§ 404.1527(d)(1), (3); *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 601 (9th

15   Cir. 1999)).  The Commissioner also argues that the ALJ rejected Dr. Wu's opinion properly

16   because it was inconsistent with reports and findings of other physicians.  *Id.* at 6 (citing 20 C.F.R.

17   § 404.1527(c)(4); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005)).

18             Second, the Commissioner contends that the ALJ evaluated Hunt's credibility properly.

19   *Id.*  In support of her position, the Commissioner asserts four arguments: (1) the ALJ evaluated the

20   record's objective evidence and determined that it was inconsistent with a disabling impairment,

21   *id.* at 7 (citing 20 C.F.R. § 404.1529(c)(2); *Morgan*, 169 F.3d at 600); (2) the ALJ found that Hunt

22   had made inconsistent statements about her daily activities and limitations, *id.* at 7–8 (citing

23   *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 693 (9th Cir. 2009)); (3) the ALJ found Hunt's

24   claim that she stopped working in August 2011 lacked credibility in light of evidence that she

25   stopped working because her job was relocated, *id.* at 8 (citing *Bruton v. Massanari*, 268 F.3d 824,

26   828 (9th Cir. 2001); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (en banc)); and (4)

27   substantial evidence supported the ALJ's findings that Hunt had been noncompliant with

28   prescribed treatment in some instances, *id.* at 8–9 (citing *Burch v. Barnhart*, 400 F.3d 676, 681

United States District Court
Northern District of California

24

1   (9th Cir. 2005); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008)).  The Commissioner

2   also notes that, even if the Court determines one or some of these reasons fall short of the clear-

3   and-convincing standard, the Court should affirm if any single reason is determined to be proper.

4   *Id.* (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008); *Thomas v.*

5   *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)).

6        Third, the Commissioner contends that, if the Court determines that the ALJ committed

7   reversible legal error in rendering her decision, the Court should remand the case to the

8   Administration for further administrative proceedings.  *Id.* at 9–10 (citing, *inter alia*, *Treichler v.*

9   *Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099–1102 (9th Cir. 2014)).  The Commissioner

10   argues that, assuming reversible error, further administrative proceedings would be appropriate in

11   this case because the record creates serious doubt regarding whether Hunt was in fact disabled.  *Id.*

12   (citing, *inter alia*, *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014)).  The Commissioner

13   also argues that the Court should refrain from applying the credit-as-true rule to the opinions of

14   Drs. Muppidi and Wu in this instance because it would result in the effective rejection of other

15   medical opinions in the record.  *Id.* at 10.

16        **3.  Hunt's Reply**

17        In response to the Commissioner's Cross-Motion, Hunt first addresses the medical opinion

18   evidence.  Reply, dkt. no. 19, at 2.  Hunt argues that the Commissioner's characterizations of Dr.

19   Muppidi's opinion and the bases for its rejection by the ALJ are inaccurate and otherwise fail to

20   show how the ALJ's rejection of Dr. Muppidi's medical assessment was proper.  *Id.*  Hunt argues

21   that the Commissioner's arguments regarding Dr. Wu are similarly faulty because they misstate

22   the record and fail to address Hunt's specific objections to the ALJ's reasoning.  *Id.* at 2–3.  Hunt

23   argues that the Commissioner does not respond to her argument that the medical opinions on

24   which the ALJ relied had "no relevance to her neurological conditions, which form the basis of her

25   disability." *Id.* at 3.  Hunt also criticizes the Commissioner's arguments regarding other medical

26   opinions supporting the ALJ's conclusions, asserting that the ALJ did not consider some of those

27   rationales in rendering her decision and, regardless, those rationales are not specific and legitimate

28   reasons for rejecting Dr. Wu's opinion.  *Id.* at 3–4 (citing, *inter alia*, *Valentine*, 574 F.3d at 692;

United States District Court<br>Northern District of California

1    *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009)).

2          Turning to the Commissioner's arguments regarding the credibility of her claims and

3    testimony, Hunt argues that the Commissioner, like the ALJ, not only mischaracterizes evidence

4    in the record, but also fails to demonstrate how the cited evidence relates to Hunt's alleged

5    disabling impairment of sensory neuropathy and the symptoms that form its basis.  *Id.* at 4.  Hunt

6    further argues that the Commissioner failed to respond to three of Hunt's arguments regarding the

7    ALJ's credibility findings: (1) the Commissioner failed to address Hunt's argument that "the ALJ

8    flagrantly erred in characterizing Ms. Hunt's electrodiagnostic testing as not supportive of her

9    sensory neuropathy"; the Commissioner "fail[ed] to acknowledge Ms. Hunt's explanation as to

10   why the activities listed in her questionnaire are not at all inconsistent with her subsequent

11   testimony"; and (3) the Commissioner failed to respond to "Hunt's argument that the balance

12   training classes recommended on one occasion cannot reasonably be construed as 'treatment,' as

13   treating neurologist Wu specifically stated that he was 'not aware of any particular treatment for

14   sensory neuronopathy.'"  *Id.* at 4–5 (citations omitted).

15         Finally, Hunt contends that the proper remedy in this case is for the Court to credit the

16   medical evidence as true, reverse the Commissioner's final decision, and remand the case with

17   instructions for the award and calculation of benefits.  *Id.* at 5–6.  Hunt argues that, in her case, the

18   record was fully developed with two medical opinions that should be accorded controlling weight,

19   but those opinions were rejected improperly by the ALJ.  *Id.* at 6.  Hunt further argues that no

20   additional information is needed to gain a clearer picture of her medical limitations, and the

21   information available demonstrates conclusively that she is disabled.  *Id.*

## III.   ANALYSIS

### A.   Legal Standard

24         When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a

25   denial of benefits only if it is not supported by substantial evidence or if it is based on legal error."

26   *Thomas*, 278 F.3d at 954 (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997))

27   (quotation marks omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence must be based on

28   the record as a whole and is "such relevant evidence as a reasonable mind might accept as

1  adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial

2  evidence "must be 'more than a mere scintilla,' but may be less than a preponderance."  *Molina v.*

3  *Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and*

4  *Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).  Even if the Commissioner's findings are

5  supported by substantial evidence, "the decision should be set aside if the proper legal standards

6  were not applied in weighing the evidence and making the decision."  *Benitez v. Califano*, 573

7  F.2d 653, 655 (9th Cir. 1978).

8       The Court must review the record as a whole, considering the evidence that supports and

9  the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273,

10  1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  "Where

11  evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that

12  must be upheld."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  However, reviewing

13  courts "are constrained to review the reasons the ALJ asserts" and "cannot rely on independent

14  findings" to affirm the ALJ's decision.  *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v.*

15  *Chenery Corp.*, 332 U.S. 194, 196 (1947)).

16       If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

17  the Court may remand for further proceedings or for a calculation of benefits.  *See Garrison*, 759

18  F.3d at 1019−21 (9th Cir. 2014).

19       **B.    The Treating Doctors' Opinions**

20       Hunt contends that the ALJ improperly rejected the opinions of her treating doctors.

21  "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who

22  treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

23  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

24  physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  "[T]he opinion of a treating

25  physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of

26  an examining physician is entitled to greater weight than that of a non-examining physician."

27  *Garrison*, 759 F.3d at 1012.  The Ninth Circuit has emphasized the high standard required for an

28  ALJ to reject an opinion from a treating or examining doctor, even where the record includes a

27

1    contradictory medical opinion:

2           If a treating or examining doctor's opinion is contradicted by
      another doctor's opinion, an ALJ may only reject it by providing
3           specific and legitimate reasons that are supported by substantial
      evidence. This is so because, even when contradicted, a treating or
4           examining physician's opinion is still owed deference and will often
      be entitled to the greatest weight . . . even if it does not meet the test
5           for controlling weight. An ALJ can satisfy the substantial evidence
      requirement by setting out a detailed and thorough summary of the
6           facts and conflicting clinical evidence, stating his interpretation
      thereof, and making findings. The ALJ must do more than state
7           conclusions. He must set forth his own interpretations and explain
      why they, rather than the doctors', are correct.

8

9           Where an ALJ does not explicitly reject a medical opinion or set
      forth specific, legitimate reasons for crediting one medical opinion
10          over another, he errs. In other words, an ALJ errs when he rejects a
      medical opinion or assigns it little weight while doing nothing more
11          than ignoring it, asserting without explanation that another medical
      opinion is more persuasive, or criticizing it with boilerplate
12          language that fails to offer a substantive basis for his conclusion.

*Garrison*, 759 F.3d at 1012–13 (quotation marks, citations, and footnote omitted).  The Court

13   agrees with Hunt that, under this standard, the ALJ rejected the opinions of Drs. Muppidi and Wu

14   improperly.

15          Before addressing those opinions individually, the Court first notes that the ALJ's reliance

16   on Dr. Gable's medical opinion was error.  Chief among the reasons that this reliance constituted

17   error was the ALJ's omission of a crucial statement from Dr. Gable's opinion—an opinion that

18   was rendered before Hunt was diagnosed with sensory neuropathy by Drs. Muppidi and Wu.

19   Specifically, Dr. Gable stated, "[T]he concerns about her balance with a history of falling several

20   times over the past month is disturbing *with no definitive diagnosis at this time*."  AR at 333.

21   Relying on Dr. Gable, who expressed concern regarding troubling symptoms for which there was

22   no diagnosis, to reject the opinions of Drs. Wu and Muppidi, who provided a definitive diagnosis

23   and further opined that it was disabling, is a clear violation of the Commissioner's regulations.

24   *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical

25   opinion, the more weight we will give that medical opinion.").

26          Furthermore, the ALJ's reliance on the opinion of Dr. Gable, an internist, as the primary

27   basis to reject the opinions of Drs. Muppidi and Wu, both neurologists, violated the

28

United States District Court
Northern District of California

Commissioner's regulations.  Under 20 C.F.R. § 404.1527(c)(5), ALJ's are instructed to "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  Here, the ALJ not only accorded more weight to the opinion of Dr. Gable, but she did so while acknowledging that "Dr. Gable's opinion is inconsistent with the treatment record, which clearly documents a diagnosis of sensory peripheral neuropathy."  AR at 22.  This acknowledgment demonstrates the logical inconsistency in much of the ALJ's opinion.  Not only does it recognize the accuracy and severity of the diagnoses rendered by Drs. Muppidi and Wu, but it also demonstrates that Dr. Gable's medical opinion lacked evidentiary value after further testing and assessment was performed by more specialized doctors.  Nonetheless, the ALJ determined that Dr. Gable's medical opinion was a basis for rejecting the opinions of Drs. Muppidi and Wu and, moreover, Dr. Gable's opinion was the most reliable medical opinion in the record.  That determination was improper.

The ALJ's attribution of great weight to Dr. Gable's opinion, but not those of Drs. Muppidi and Wu, without sufficient explanation also violated the Commissioner's regulations regarding the weight ALJ's must give to medical opinion sources.  Those regulations instruct an ALJ to give more weight to medical opinions from treating sources since they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of . . . consultative examinations . . . ."  20 C.F.R. § 404.1527(c)(2).  In other words, it was both improper and illogical for the ALJ to grant great weight to Dr. Gable's limited medical opinion—which offered no diagnosis for one of Hunt's severe impairments, was rendered after a single consultative examination, and was otherwise inconsistent with the medical record—while rejecting the opinions of Hunt's more specialized treatment providers, Drs. Muppidi and Wu.

Likewise, the ALJ's reliance on the medical opinions of Drs. Nasrabadi and Reddy was error.  Like Dr. Gable opinion, Drs. Nasrabadi and Reddy lack the neurological expertise of Drs. Muppidi and Wu.  *See* AR at 76–80; 88–93.  Also like Dr. Gable's opinion, the opinions of Drs.

1   Nasrabadi and Reddy preceded the diagnoses provided Drs. Muppidi and Wu.  *See id.*

2   Compounding the ALJ's error, Drs. Nasrabadi and Reddy relied on the results of Dr. Gable's

3   examination and his opinion when they issued their findings on Hunt's RFC.  *See id.*  Finally, Drs.

4   Nasrabadi and Reddy were nonexamining doctors whose opinions are generally accorded less

5   weight than treatment provides like Drs. Muppidi and Wu.  *See* 20 C.F.R. § 404.1527(c)(1)–(2).

6       The ALJ's reliance on the opinion of Dr. Nelp, which the ALJ granted "partial weight,"

7   does not support the rejection of the opinions rendered by Drs. Muppidi or Wu.  In the decision,

8   the ALJ did not discuss Dr. Nelp's opinion regarding the severity of Hunt's sensory neuropathy.

9   *See* AR at 23.  Rather, the ALJ only observed that Dr. Nelp had opined that Hunt's "impairment

10  did not meet or equal any listing" and that Dr. Nelp's RFC opinion was "generally consistent"

11  with the ALJ's findings.  *Id.*  These generalities fall short of constituting specific and legitimate

12  reasons for rejecting the opinions of Drs. Muppidi and Wu, and the Court may only consider the

13  reasons asserted by the ALJ.  *See Connett*, 340 F.3d at 874.  However, the Court notes that Dr.

14  Nelp's opinion suffers from several of the same deficiencies as the opinions of Drs. Gable,

15  Nasrabadi, and Reddy, especially in light of Dr. Nelp's statements that those doctors—who never

16  considered the fact that Hunt suffered from sensory neuropathy—provided "[g]ood" and

17  "[e]xcellent" reviews of the issues affecting Hunt's health.  *See* AR at 42–44.

18          **1.   Rejection of Dr. Muppidi's Opinion Was Improper**

19      In rejecting Dr. Muppidi's medical opinion, the ALJ offered two reasons: (1) Dr. Muppidi

20  had opined on a question reserved for the Commissioner; and (2) Dr. Muppidi had failed to

21  include specific work limitations with his opinion.  These reasons fall short of being specific and

22  legitimate.  Furthermore, that cursory consideration of Dr. Muppidi's opinion caused the ALJ to

23  commit a variety of other substantial errors.

24      As Hunt argues, the ALJ improperly rejected Dr. Muppidi's opinion on the grounds that he

25  opined on the ultimate question of disability.  Although the ALJ correctly observed that

26  determining legal disability is reserved for the Commissioner, *see* 20 C.F.R. § 404.1527(d)(1), the

27  Ninth Circuit has repeatedly addressed the breadth of that rule, *see, e.g.*, *Hill v. Astrue*, 698 F.3d

28  1153, 1160 (9th Cir. 2012); *Rodriguez*, 876 F.2d at 761–62.  Recently, a district court outlined that

*United States District Court*
*Northern District of California*

1  rule in detail:

> 2  Statements by a medical source opining that a claimant is disabled
> 3  are excluded as medical opinions because the final determination
> about a claimant's disability is reserved to the Commissioner. That
> 4  is, a medical source's conclusory statement that a claimant is
> "disabled" or "unable to work" does not bind the Commissioner to
> 5  find the claimant is disabled. Nevertheless, statements by a medical
> source about a claimant's likelihood of being able to sustain
> 6  employment are not conclusory as defined in 20 C.F.R.
> § 404.1527(d)(1).

7  *Lee v. Colvin*, 80 F. Supp. 3d 1137, 1146 (D. Or. 2015) (citations and footnote omitted).

8      Here, Dr. Muppidi's opinion consisted of explaining that he and his staff were evaluating

9  Hunt for "progressive gait imbalance (Ataxia) and sensory neuropathy."  Dr. Muppidi then opined

10  that Hunt's condition made it "very difficult to ambulate safely and perform routine work related

11  activities safely," that she was "significantly disabled," and that she would likely remain disabled

12  for the foreseeable future.  AR at 405.  Thus, Dr. Muppidi's opinion was not a single, conclusory

13  statement that Hunt was disabled.  It also included an explanation, albeit a brief one, that Hunt's

14  ataxia and sensory neuropathy made it unsafe for her to ambulate or perform routine work.  The

15  ALJ's rejection of Dr. Muppidi's medical opinion on this basis was, standing alone, insufficient to

16  constitute a specific and legitimate reason.  *See* SSR 96-5P ("[O]pinions from any medical source

17  on issues reserved to the Commissioner must never be ignored.").

18      The ALJ's rejection of Dr. Muppidi's opinion for failing to include specific work

19  limitations was also improper.  Dr. Muppidi's brevity did not excuse the ALJ from evaluating the

20  records of treatment that he provided to Hunt.  To the contrary, the Commissioner's regulations

21  required the ALJ to consider Dr. Muppidi's opinion "together with the rest of the relevant

22  evidence [the Administration] receive[d]."  *See* 20 C.F.R. § 404.1527(b).  Although the ALJ

23  reviewed some of the record, the ALJ discounted or ignored records of treatment provided by Dr.

24  Muppidi without explanation.

25      This failure to consider Dr. Muppidi's opinion substantively further caused the ALJ to

26  commit several other errors.  On this point, *Garrison* is instructive.  There, the Ninth Circuit found

27  that an ALJ had erred by ignoring several of a doctor's treatment records, notes, and the medical

28  test results on which the doctor had relied; failing to evaluate those records for internal

United States District Court
Northern District of California

31

1    consistency; and failing to accord deference to the doctor, who had served as the claimant's

2    treating physician. *Garrison*, 759 F.3d at 1013; *see also* 20 C.F.R. § 404.1527(c)(2)–(5).  Here,

3    the ALJ's rejection of Dr. Muppidi's opinion suffers from the same errors.

4         It is understandable, however, that the recency and rarity of Hunt's neurological diagnoses

5    caused confusion and uncertainty regarding Dr. Muppidi's medical opinion and Hunt's ultimate

6    disability status.  An ALJ should not disregard a medical opinion in such circumstances.  Rather,

7    when an ALJ finds a medical record to be incomplete or inconsistent due to a treatment provider's

8    recent diagnosis of a rare condition after the claimant has already undergone a consultative

9    examination, the ALJ should further develop the medical record.  *See* 20 C.F.R.

10   § 404.1520b(b)(2)(i)–(iv) (explaining that, where there is incomplete or inconsistent evidence, the

11   Administration "may recontact [a claimant's] medical source," "request additional existing

12   evidence," "ask [a claimant] to undergo a consultative examination," or ask "for more

13   information."); *see also* § 404.1519a(b)(4) (explaining that the Administration "may require a

14   consultative examination" when "[t]here is an indication of a change in your condition that is

15   likely to affect your ability to work, but the current severity of your impairment is not

16   established.").  Further development of the medical record in relation to Dr. Muppidi's opinion

17   was appropriate here.

18              **2.   Rejection of Dr. Wu's Opinion Was Improper**

19        The ALJ offered only one general rationale to support her rejection of Dr. Wu's medical

20   opinion: that Dr. Wu's opinion is inconsistent with Hunt's reports to other physicians and the

21   results of other physical and neurological examinations.  Those examinations included the

22   examination performed by Dr. Gable, which "revealed no atrophy," and those performed by Dr.

23   Doan, which revealed no muscle weakness, tremor, balance impairment, or abnormal gait.  This

24   rationale is insufficient to reject Dr. Wu's opinion.

25        The ALJ erred by failing to accord deference to the opinion of Dr. Wu, who treated Hunt

26   on several occasions.  As explained above, the Commissioner's regulations instruct ALJs to give

27   more weight to treating sources and specialists.  *See* 20 C.F.R. § 404.1527(c)(2), (5).  With little

28   explanation, the ALJ rejected Dr. Wu's medical opinion, including the portion of it contained in

United States District Court
Northern District of California

32

1   the Residual Functional Capacity Questionnaire, with the conclusory statement that the opinion

2   was inconsistent with other parts of the record, including the records of Drs. Gable and Doan.

3   Nevertheless, the ALJ accepted Dr. Wu's diagnosis of sensory neuropathy and found that it

4   constituted a severe medical impairment.  *See* AR at 16.

5         This conclusion is untenable.  It cannot be the case that, on the one hand, Dr. Wu's

6   diagnosis is supported by the medical record, but, on the other hand, his findings related to that

7   diagnosis are unsupported by virtue of medical examinations preceding that diagnosis and

8   conducted by doctors who lacked Dr. Wu's expertise in a rare medical condition.  Similarly, it is

9   insufficient to conclude that records denoting that Dr. Wu was treating Hunt's neurological

10  conditions constituted a basis for rejecting Dr. Wu's opinion, as Dr. Doan noted in one of his

11  records.  Although Dr. Doan's treatment records might conflict with those of Drs. Muppidi and

12  Wu, in the context of this record and in light of the fact that the ALJ did not further develop the

13  record, Dr. Doan's treatment records fall short of substantial evidence.[7]

14        **C.    Determination that Hunt Lacked Credibility Was Error**

15         Hunt contends that the ALJ failed to provide clear and convincing reasons for finding that

16  she lacked credibility.  To assess the credibility of a claimant's testimony regarding her subjective

17  pain and symptoms, an ALJ must engage in a two-step analysis.  *Garrison*, 759 F.3d at 1014.

18  First, the ALJ determines whether the claimant presented objective medical evidence of an

19  impairment that could reasonably be expected to produce the alleged pain and symptoms.  *Id.*

20  (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (2007)).  At this step, the claimant need

21  only show that the impairment could reasonably have caused some of the alleged pain and

22  symptoms.  *Id.* (citing *Smolen*, 80 F.3d at 1282).  If the first step is met and there is no evidence of

23  malingering, the ALJ can reject the claimant's testimony only by providing specific, clear, and

24  convincing reasons.  *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281; *Robbins v. Soc. Sec.*

25  *Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)).  The Ninth Circuit has stated that "[t]he clear and

26

27  [7] Although it is not made clear in the records of Hunt's appointments with Dr. Doan, both parties
    acknowledge in their briefs that Dr. Doan only treated Hunt for diabetes.  *See* Mot. at 13; Cross-
28  Mot. at 3.  Their acknowledgment is corroborated by the fact that Dr. Doan performed treatment
    as part of the Silicon Valley Kidney Associates.  *See* AR at 384.

United States District Court
Northern District of California

1  convincing standard is the most demanding required in Social Security cases." *Id.* at 1015

2  (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

3        Here, the ALJ found that Hunt's "medically determinable impairments could reasonably be

4  expected to cause the alleged symptoms; however, [her] statements concerning the intensity,

5  persistence and limiting effects of these symptoms are not entirely credible." AR at 18.  The ALJ

6  further stated that "the inconsistent information provided by [Hunt] may not be the result of a

7  conscious intention to mislead; nevertheless, the inconsistencies suggest that the information

8  provided by [her] generally may not be entirely reliable." *Id.* at 21.  The ALJ found no evidence

9  of malingering.  Therefore, the ALJ's reasons for rejecting Hunt's testimony must be specific,

10  clear, and convincing.  The Court addresses each basis for rejecting Hunt's opinion in turn and

11  concludes that, although one basis has some persuasive force, it is insufficient standing alone to

12  support the finding that Hunt's testimony lacked credibility.

13        The Court finds unpersuasive the ALJ's reasoning that Hunt had made conflicting

14  statements regarding her balance issues, grocery shopping, falling, numbness, and asthma attacks.

15  *See id.* at 20–21.  As Hunt argues, the ALJ arrived at these conclusions after mischaracterizing,

16  decontextualizing, and even misquoting several of Hunt's statements.  For example, regarding

17  Hunt's allegedly inconsistent statements, the ALJ found that Hunt "told Dr. Gable during her

18  consultative examination[] that she had a balance problem with a history of falling several times

19  *over the past month* . . . ."  AR at 20.  However, Dr. Gable's record of his examination does not

20  indicate that Hunt made such a claim, only that Hunt "has fallen on several occasions." *Id.* at 331.

21  There is no reference in the record of Dr. Gable's to falls in the preceding month.  *See id.*

22        The ALJ also found that Hunt had testified to a constant feeling of instability, which was

23  inconsistent with her claim in the Exertion Questionnaire that coughing attacks, not balance issues,

24  caused her to fall and need assistance from her husband.  *Id.* at 20–21.  Hunt's full statement in

25  that questionnaire reads:

26                I have a very bad balance problem when walking. I am weak and
              fatigued. I have to hold onto my husband to walk. . . .

27

28                If I stand up too fast my equilibruim [*sic*] is unbalanced. I cannot
              bend over or . . . reach for items. When I have my coughing attacks I

United States District Court
Northern District of California

1    sometimes fall, as I have fell [*sic*] recently twice in my bathroom.

2    I walk from our parking space, holding tightly to my husband's arm,
3    dreading each step. Sometimes I have a coughing (attack) and my
     asthma act[s] up . . . .

4    *Id.* at 161 (original parentheses).  Thus, Hunt never stated that her coughing attacks *caused* her

5    balance issues.  Rather, she stated that she had balance issues and that her coughing attacks made

6    those issues worse.  Thus, the ALJ's finding that Hunt's testimony regarding her balance issues

7    and falls is more a selective mischaracterization of Hunt's statements than a clear and convincing

8    reason for finding that Hunt lacked credibility.

9        In an instance of misquoting Hunt and mischaracterizing the record, the ALJ found that

10   Hunt had "reported having asthma attacks *every* morning and late at night" in the Asthma

11   Questionnaire, while the "treatment record" indicated that her asthma was well-controlled.  *Id.*

12   at 21 (emphasis added).  First, in the questionnaire, Hunt in fact stated that she had asthma attacks

13   in the "*early* mornings, evenings, and late at night, with coughing spells periodically."  *Id.* at 166

14   (emphasis added, punctuation altered).  She did not claim to have asthma attacks *every* morning.

15   *See id.*  Hunt did state that her asthma "is a constant problem."  *Id.* at 167.  Even that statement,

16   however, does not support the ALJ's finding when considered with the questionnaire as a whole,

17   where Hunt explained how she used her two inhalers and that she "follow[ed] the directions [of

18   her doctor] to a tee.  You never want to over medicate."  *Id.* at 166.  Second, the ALJ did not

19   support her finding that Hunt's asthma was well-controlled by citing to a *treatment record.  See id.*

20   at 21 (citing *id.* at 331).  Rather, the ALJ cites to the record of Dr. Gable's consultative

21   examination in which he notes that Hunt informed him of "hav[ing] asthma for 5 years.  That is

22   supposed to be under good control with inhalers."  *Id.* at 21, 331.  Thus, the record demonstrates

23   that the ALJ is mistaken in finding that Hunt's statements regarding her asthma are inconsistent.

24   The ALJ is also mistaken in claiming that the inconsistency is demonstrated through records of

25   Hunt's treatment for the condition.

26       The ALJ also found that Hunt made inconsistent statements regarding her grocery

27   shopping and cleaning her home, reasoning that Hunt denied doing any grocery shopping or house

28   cleaning in the Exertion Questionnaire, but, during her testimony, she stated that she goes grocery

United States District Court
Northern District of California

35

shopping with her husband and vacuums once each week. *Id.* at 21. Hunt argues that the inconsistency is overstated, pointing to the language of the questions asked: "Do you do your own grocery shopping," and "[d]o you clean your own home or living area?" Mem. at 17 (citing AR at 162). Emphasizing the presence of the word *own* in those questions and the questions' breadth, Hunt asserts that she testified to going grocery shopping with her husband, never alone. *Id.* (citing AR at 54–55). She also asserts that she testified that the only housework she could perform alone was vacuuming, which had become increasingly difficult, and that she could not clean her dishes without help from her husband. *Id.* (citing at AR 55.) The Court is persuaded by these arguments and further observes that, even to the extent that Hunt's statements are inconsistent, the inconsistencies fall far short of showing that Hunt lacked credibility or was capable of working.

Finding that Hunt made a statement that conflicted with the record, the ALJ pointed to Hunt's claim in the Exertion Questionnaire that "she lost all the muscle tissue in her bilateral legs . . . . The objective evidence does not support this report. A physical examination of the claimant's extremities performed on September 3, 2013 revealed no atrophy." *Id.* at 21 (citations omitted). While the ALJ is correct that Dr. Gable, who conducted that physical examination, had found no evidence of leg-muscle atrophy, Dr. Wu did find evidence of and diagnosed Hunt with leg-muscle atrophy less than five months later. *See id.* at 331, 355. The Court would usually defer to the ALJ's interpretation of this evidence, however, this finding by the ALJ conflicts directly with another finding that the ALJ made in her decision. In assessing Hunt's RFC with respect to her sensory neuropathy, the ALJ found that Hunt had been diagnosed with, among other things, "some leg muscle atrophy probably due to disuse." *Id.* at 19. In short, the ALJ found that "objective evidence d[id] not support" Hunt's claim of leg-muscle atrophy right after finding that Hunt had in fact been diagnosed with the condition. This reason for finding that Hunt lacked credibility is, therefore, neither clear nor convincing.

The ALJ further found that Hunt had made inconsistent statements to Drs. Muppidi and Wu respectively. *Id.* at 21. According to the ALJ, Hunt first claimed to Dr. Wu that she had fallen on three occasions, one fall occurring in July 2013. *Id.* Then, two months later, Hunt claimed to Dr. Muppidi that she had fallen twice, and Dr. Muppidi's records do not mention a fall

36

that occurred in July 2013.  *Id.*  Even accepting the ALJ's factual premise, Dr. Muppidi's

conclusion—that Hunt was severely disabled from sensory neuropathy and suffered from

significant difficulties ambulating despite the alleged omission—suggests that the inconsistency

was unimportant to assessing Hunt's health.  Therefore, the Court is not convinced that this single

alleged omission from a doctor's treatment records indicates that Hunt lacked credibility or had

overstated the severity of her sensory neuropathy.

Identifying another alleged inconsistency, the ALJ found that Hunt had denied difficulty

and balance issues during physical examinations, citing to Dr. Doan's treatment records as

evidence.  *Id.* at 21 (citing *id.* at 385, 388).  The ALJ is correct that Dr. Doan noted that Hunt had

"no difficulty with balance."  *Id.* at 385; *see also* 388.  However, Dr. Doan's records stand in stark

contrast with the rest of the medical record, both in specific regard to Hunt's balance issues and in

general regard to Hunt's other well-documented ailments.  As stated above, the records of

treatment provided by Dr. Doan's, which the parties agree was for diabetes only, appear unreliable

for assessing Hunt's overall health in the context of the record as a whole.  Thus, the ALJ's

reliance on them to find that Hunt lacked credibility is not clear or convincing.

Hunt's alleged noncompliance with treatment recommendations also lacks persuasiveness.

Two of those treatment recommendations pertained to health issues that did not serve as the basis

of Hunt's alleged disability: diabetes and hypertension.  Furthermore, Hunt's decision not to

comply with those treatment recommendations appears even more benign considering the alleged

severity of her sensory neuropathy and that one of the recommendations required aerobic training.

The other treatment recommendation—balance training—was offered by Dr. Wu, who later

averred that he was unaware of any particular treatment for sensory neuropathy.  Therefore, it is

unclear how this apparent noncompliance demonstrated that Hunt lacked credibility in regard to

the severity of her sensory neuropathy and its concomitant symptoms.

The timing and circumstances of Hunt's decision to stop working entirely while collecting

unemployment benefits would usually be evidence that a claimant lacked credibility.  Here,

however, Hunt not only testified that her symptoms had started before she stopped working, but

the record demonstrates that the source of those symptoms was a rare condition that went

1  undiagnosed for several years.  In other words, it appears unreasonable to expect Hunt to know

2  whether she was disabled and act in absolute accordance with that conclusion when her doctors

3  had failed to diagnose her with a rare, but severe condition.

4         Overlaying the Court's analysis of the ALJ's reasoning is one particular consideration:

5  Hunt was first diagnosed with what Dr. Nelp described as a "very unusual condition" in early

6  2014, more than two years after she first alleged that she was disabled and long after many of the

7  medical records were created and opinions were rendered.  *See* AR at 46, 347, 362–63.  The

8  record also contains records of several test results that were "abnormal."  *See, e.g.*, AR at 362,

9  367, 373.  Dr. Gable himself noted that Hunt was "a good historian but the case [was]

10  complicated" and "she [did] a good job of trying to explain what is wrong."  *See* AR at 331.  The

11  ALJ herself explained that "the inconsistent information provided by [Hunt] may not be the result

12  of a conscious intention to mislead."  *Id.* at 21.  In other words, the ALJ did not find that Hunt had

13  lied.  Therefore, the circumstances of Hunt's recent diagnosis dictate that Hunt's credibility should

14  be reassessed.

15         **D.    Remand for Further Proceedings Is Proper**

16         Hunt contends that her testimony and her treating doctors' medical opinions should be

17  credited as true.  *See* Reply at 9–10.  If an ALJ has failed to credit medical opinion evidence or

18  claimant testimony, and that failure constitutes legal error, a district court must credit that

19  evidence as true and remand for an award of benefits provided that three conditions are satisfied:

20         (1) the record has been fully developed and further administrative
       proceedings would serve no useful purpose; (2) the ALJ has failed to
21         provide legally sufficient reasons for rejecting evidence, whether
       claimant testimony or medical opinion; and (3) if the improperly
22         discredited evidence were credited as true, the ALJ would be
       required to find the claimant disabled on remand.

23  *Garrison*, 759 F.3d at 1019–20; *see also Treichler*, 775 F.3d at 1100–01.  If the three conditions

24  are satisfied, the Court should not remand for further administrative proceedings to reassess

25  credibility.  *See Garrison*, 759 F.3d at 1019–21.  Rather, the Court should remand the case for the

26  award and calculation of benefits.

27         As stated above, the record has not been fully developed, and the Administration has not

28

United States District Court
Northern District of California

38

had the opportunity to have a consultative examiner evaluate Hunt's sensory neuropathy independently or seek further evidence from Dr. Muppidi.  The Administration should have that opportunity before a determination of disability is rendered.  As a result, further development of the record appears necessary to determine whether Hunt became disabled in August 2011 or sometime thereafter.

**IV.    CONCLUSION**

For the reasons stated above, the Court GRANTS in part and DENIES in part Hunt's Motion for Summary Judgment, DENIES the Commissioner's Cross-Motion for Summary Judgment, and REMANDS the case for further administrative proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: March 30, 2017

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California